**Mark L. GORDON, as Administrator of the Estate of Ruth Slavin, and Rachelle Gordon, Plaintiffs–Appellants and Cross–Appellees,**

v.

**UNITED VAN LINES, INC., Defendant–Appellee and Cross–Appellant.**

Nos. 96–2346, 96–2442.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1997.

Decided Nov. 21, 1997.

Steven R. Merican (argued), Warren S. Radler, Jose A. Isasi, II, Rivkin, Radler & Kremer, Chicago, IL, for Mark L. Gordon in No. 96–2346.

Warren S. Radler, Jose A. Isasi, II, Rivkin, Radler & Kremer, Chicago, IL, Sally H. Saltzberg, Loftus & Saltzberg, Chicago, IL, for Rachelle Gordon in No. 96–2346.

Marcos Reilly, Thomas F. Ging (argued), Robert H. Smeltzer, Hinshaw & Culbertson, Chicago, IL, for United Van Lines, Inc. in No. 96–2346.

Warren S. Radler, Steven R. Merican (argued), Rivkin, Radler & Kremer, Chicago, IL, Sally H. Saltzberg, Loftus & Saltzberg, Chicago, IL, for Mark L. Gordon and Rachelle Gordon, in No. 96–2442.

Marcos Reilly, Thomas F. Ging (argued), Hinshaw & Culbertson, Chicago, IL, for United Van Lines, Inc. in No. 96–2442.

Before COFFEY, MANION, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

When the elderly and ailing Ruth Slavin decided to move from her home in Florida to the Chicago area, in order to be close to her daughter, she turned to United Van Lines to handle the relocation of her personal belongings. What resulted can only be described as every family's worst nightmare: from its earliest contact with her, through its agent who never made clear to her what kind of coverage she needed for her goods, to its failure to deliver her most priceless family memorabilia and heirlooms and its four-month course of deception pertaining to that nondelivery, United represented everything wrong with a moving company. Eventually, Mrs. Slavin (who has since died and whose estate, through its administrator Mark Gordon, continues as a litigant) and her daughter

Rachelle Gordon (collectively, the Gordons) sued United under a variety of theories. They prevailed before a jury in their action for liability under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707 (1994), now codified at 49 U.S.C. § 14706, but the district court dismissed the remaining counts of their suit before trial as preempted by the Carmack Amendment.

The principal question before us is whether the district court properly understood the breadth of the Carmack Amendment's preemptive force. We also must decide whether federal common law provides a basis for awarding punitive damages in a Carmack Amendment suit, and whether the district court properly allowed the jury to award damages for some of the items that United had destroyed. We reaffirm our holding in *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407 (7th Cir.1987), that the Carmack Amendment preempts all state law claims based upon the contract of carriage, in which the harm arises out of the loss of or damage to goods. Nevertheless, in keeping with *North American Van Lines, Inc. v. Pinkerton Security Systems, Inc.*, 89 F.3d 452 (7th Cir.1996), we also reaffirm that claims involving a separate and independently actionable harm to the shipper distinct from such damage are not preempted. Because we find that one of the Gordons' claims is not preempted under these two cases, we reverse that part of the case for further proceedings. Otherwise, we find no error in the district court's rulings.

**I**

At the time Mrs. Slavin decided to move, she was an 80–year old widow in failing physical health. She was legally blind in one eye, and the vision in her other eye was so impaired that she could no longer read. She also wore a hearing aid, was able to walk only with the aid of a walker, and could not write because of her arthritis. She called a United Van Lines agency in Florida, where she was then living, and it sent one of its agents to her home. There she met twice with the agent, who was aware of her limited sight, impaired hearing, and manual difficulties. She specifically instructed the agent that some of her items were to go to her new apartment in Chicago, and others were to go to her daughter Rachelle's home. She explained that the boxes going to Rachelle's contained the most important things she owned: linens and candlesticks handed down from her own mother, about 200 old and rare books collected by her deceased husband, china cups from around the world that she had collected over a period of 40 years, and approximately 15,000 family photographs. The photographic collection covered a period of more than 100 years. It included a picture of her mother and her mother's two sisters taken in Europe in the early days of 19th century photography, other photographs dating from the 1860's, immigration photographs from her mother's family, photographs of historic significance including many of her father with such personalities as Clarence Darrow, Adlai Stevenson, Michigan Governor G. Mennen Williams, and President Franklin Delano Roosevelt, as well as countless photographs of more personal interest.

The jury found that United's agent never obtained Mrs. Slavin's agreement regarding insurance against the loss of her treasured possessions. At the time the contract was signed, the agent simply wrote in the bill of lading that Mrs. Slavin released United from liability for loss or damage to the goods exceeding $1,000. Mrs. Slavin, before her death, testified that she did not read the bill of lading before she signed it, for the simple reason that she was physically unable to do so—a fact which she told the agent. For its part, United now concedes that it charged her for $10,000 of Replacement Cost Protection.

United never delivered any of the goods destined for Rachelle's home. On May 7, 1993, after the driver delivered to Mrs. Slavin the boxes marked for her apartment, he told her that he was taking the other boxes over to the Gordons' home. Mrs. Slavin called Rachelle and told her the driver was on his way with the ten boxes and would be there in a matter of minutes. (The two lived just one mile apart.) Rachelle waited, but no one showed up. Hours later, the driver contacted her and told her that he had decided instead to drive to the Cook Moving depot

(United's local agent) in Elk Grove Village. He said that he would deliver the boxes the next day (a Saturday), because he did not want to drive back into Chicago through the afternoon traffic. Saturday came and went, Rachelle waited, but no one from United arrived. As later became clear, the driver had decided not to deliver the boxes himself. Rather, on Friday afternoon he had put the boxes into the car of one Tom Walker, a day laborer recommended by Cook's operations manager, paid Walker $40, and told him to deliver the boxes the next day. To put it mildly, Walker fell down on the job. Instead of delivering the boxes as promised, he threw them away, and they were incinerated.

Concerned about the fate of the boxes when they did not show up on Saturday, Rachelle called the numbers United had furnished on the shipping invoice on the following Monday to try to find out what had happened. The dispatcher at Cook Moving told her that he "knew all about" her shipment, that the driver had been called out of town, and that she would have her goods by the end of the week. Again, of course, no delivery took place. Rachelle again called Cook Moving to ask about it. She continued calling for nearly three months. Each time she called, she was told that the items were in the United warehouse and were safe there. Finally, on August 3, United sent Rachelle a claim form, acknowledging the loss of that part of the shipment.

## II

On December 3, Mrs. Slavin and Rachelle Gordon filed suit against United to recover for their losses. (Mrs. Slavin, as we noted, died during the pendency of the suit, and Mark Gordon, the administrator of her estate, was substituted for her.) Their suit asserted breach of the contract for carriage (Count I); liability under the Carmack Amendment (Count II); liability under the Bill of Lading Act, 49 U.S.C. § 102 (Count III); common law fraud (Count IV); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (Count V); intentional infliction of emotional distress (Count VI); breach of contract (Count VII); and willful and wanton

misconduct (Count VIII). In addition to actual damages and attorneys' fees, they also requested awards of punitive damages for Counts II, IV, VII, and VIII.

In two pretrial orders, the district court first granted summary judgment for United on all counts except Count II (the Carmack Amendment), finding that there was no private right to sue under the Bill of Lading Act and that the Carmack Amendment preempted all the other claims. It then granted partial summary judgment to United on Count II, finding that neither punitive damages nor emotional distress damages were recoverable under the Carmack Amendment. Count II then proceeded to trial before a jury, which returned a verdict for the Gordons in the amount of $59,550. In response to interrogatories, the jury found that (1) United had not proven that it had obtained Ruth Slavin's agreement as to her choice of liability or given her a reasonable opportunity to choose between two or more levels of liability, (2) the photographs United lost, or some of them, had a fair market value of $52,500, and (3) the photographs that United lost that did not have a "fair market value" had a value of $7,050 to the Gordons "excluding fanciful and sentimental value."

## III

The Gordons raise two principal arguments on appeal: first, they claim that the district court erred in granting partial summary judgment to the effect that punitive damages and emotional distress damages are not recoverable under the Carmack Amendment; second, they argue that their state law claims (Counts I, IV, V, VI, VII, and VIII) were not preempted because they did not seek damages in connection with the shipment of the goods. United has cross-appealed, asserting that the Carmack Amendment permits recovery only of the "fair market value" of the items lost, and thus that the $7,050 portion of the jury's verdict must be set aside.

### A. Carmack Amendment Claims

■ 1. *Recoverability of Punitive and Emotional Distress Damages.* The Carmack

Amendment provides shippers with the statutory right to recover for actual losses or injuries to their property caused by carriers involved in the shipment. See 49 U.S.C. § 11707(a)(1) (1994). (As we noted in *Pinkerton*, the Interstate Commerce Commission Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803, amended and recodified this provision of the Carmack Amendment at 49 U.S.C. § 14706(a)(1). See 89 F.3d at 454 n. 1. None of the modifications is pertinent to this appeal. Therefore, for ease of reference we refer to the former sections of Title 49 in our discussion.) It reads, in pertinent part:

> A common carrier ... subject to the jurisdiction of the Interstate Commerce Commission ... shall issue a receipt or a bill of lading for property it receives for transportation.... That carrier ... and any other common carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission ... are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (1) the receiving carrier, (2) the delivering carrier, or(3) another carrier over whose line or route the property is transported in the United States.

There is virtually no legislative history for the statute—a circumstance of no great concern for those who distrust this source of interpretation, see, *e.g., Dunn v. Commodity Futures Trading Commission*, —— U.S. ——, ——, 117 S.Ct. 913, 921, 137 L.Ed.2d 93 (1997) (Scalia, J., concurring) (agreeing with otherwise unanimous decision, with the caveat that the Court's determination that it should give effect to the plain meaning of the statute at issue was "contradicted, however, by the Court's extensive discussion of legislative history, ... as though that were necessary to confirm the 'plain meaning of the language,' or (worse) might have power to overcome it"); Frank Easterbrook, *Legal Interpretation and the Power of the Judiciary*, 7 Harv. J.L. & Pub. Pol'y 87 (1984)—so we must decide based on the language of the statute and more general principles of interpretation whether it is permissible for us to

find attached to this statute a general federal common law right to recover punitive or emotional distress damages.

One other court of appeals has considered this precise question, while another has looked at something closely analogous. The Second Circuit, in *Cleveland v. Beltman North American Co.*, 30 F.3d 373 (2d Cir. 1994), ruled that no federal common law right to punitive damages exists in a Carmack Amendment suit. First, after canvassing other decisions on the subject, it concluded that the availability of punitive damages (even under federal common law) would "frustrate the uniformity goal of the Carmack Amendment." *Id.* at 379. Second, and more importantly, it noted that Congress has specifically addressed the issue of compensation for shippers in the Carmack Amendment, in the statutory language quoted above. *Id.* at 380. The Carmack Amendment itself is just part of a complex web of regulations issued and enforced (at the time) by the Interstate Commerce Commission (and now the responsibility of the Surface Transportation Board, see 49 U.S.C. § 13501). Under the circumstances, the Second Circuit thought, the Supreme Court's admonition in *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), not to use federal common law to supplement comprehensive legislation was particularly apt. *Cleveland*, 30 F.3d at 380.

The Fourth Circuit, in a suit brought to enforce the duty of nondiscrimination among shippers imposed by 49 U.S.C. § 316(d), now codified at 49 U.S.C. § 10741, held that a private right of action exists in such cases and that in a proper case punitive damages and damages for mental distress may be recovered. *Hubbard v. Allied Van Lines, Inc.*, 540 F.2d 1224 (4th Cir.1976). It looked to decisions finding a similar private right of action under the Civil Aeronautics Act to support its holding. Of interest here is the court's discussion of the defendant Allied's argument that the Carmack Amendment precluded punitive and mental distress damages. Looking at the original codification of the

Carmack Amendment, 49 U.S.C. § 20(11),[1] the court thought that the limitation to "actual" damages meant only that liability for actual loss could not be restricted by contract or tariff, while additional liability could be. 540 F.2d at 1228. It also found further support for its decision in the savings clause in the Carmack Amendment, 49 U.S.C. § 20(11), recodified in 1978 to 49 U.S.C. § 10103 (and now codified at 49 U.S.C. § 15103), which we discuss below.

In our view, the Second Circuit's decision in *Cleveland* takes the correct approach. (Indeed, it is possible that the Fourth Circuit would view a suit to recover on a receipt or a bill of lading the same way. In such a case there is no need to find an implied private right of action, as it was required to do for purposes of the nondiscrimination duty, and the analysis of federal common law rights would necessarily be quite different.) The *Hubbard* approach fails to take into account the purpose of the limitation to actual loss, which is to create a measure of predictability for interstate carriers in the exposure to damages they face. See *Hughes*, 829 F.2d at 1415 ("The purpose of [the Carmack Amendment] is to establish uniform federal guidelines designed in part to remove the uncertainty surrounding a carrier's liability when damage occurs to a shipper's interstate shipment."). Even if we assume that a federal common law rule with respect to punitive damages would be uniform nationally, the punitive damages remedy would displace the package of remedies that the Interstate Commerce Act contains, and would allow precisely the uncertainty the Carmack Amendment was designed to bar. When Congress has spoken this carefully to the subject of remedies, it would exceed the proper role of the court for us to read in additional or different remedies. *Cf. Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (refusing to find an implicit right to

contribution under the Sherman and Clayton Acts).

■ 2. *Cross–Appeal: The Market Value Measure of Damages.* Before turning to the Gordons' argument that their state law claims were erroneously dismissed, we address United's cross-appeal, which also arises under the Carmack Amendment. United claims that the jury acted beyond its authority when it awarded $7,050 for the loss of the photographs that did not have a "clear" fair market value. It characterizes this part of the award as the "non-economic portion of the judgment," and on that basis, argues that the Carmack Amendment forbids this recovery. The Carmack Amendment allows a plaintiff to recover only economic loss, and United asserts that the $7,050 does not meet this test.

■ In so arguing, however, United is not presenting the full picture that was before the jury. Furthermore, our review of a jury verdict is quite restricted. We may disturb a jury's award only if it is "monstrously excessive," there is no rational connection between the award and the evidence, or it is not "roughly comparable to awards made in similar cases." See *U.S. EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir.1995). United objected to the instruction that the court gave on the measure of damages and proposed a different one; the parties now dispute whether it is entitled to urge on appeal that the instruction itself was erroneous or if this argument has been waived. The difference between the two instructions is minor in any event. The court instructed the jury as follows:

> The actual loss of the Slavins' photographs is the Fair Market Value of the lost photographs which have a Fair Market Value. For those photographs that do not have a Market Value, the measure of damages is the actual loss or fair value which the

---

1. Subtitle IV of Title 49, including § 20(11), was recodified by Act of Oct. 17, 1978, Pub.L. No. 95–473, 92 Stat. 1337. The Carmack amendment, previously at § 20(11), was recodified at §§ 10103, 11707, and 10730, with the provisions at issue in *Hubbard*, and in this case, codified at § 11707. While Pub.L. No. 95–473 reworded the Carmack amendment slightly (for example

dropping the word "full" from the phrase "full actual loss, damage, or injury"), the Act was not intended to effect any substantive changes. See *Id.* § 3(a), 92 Stat. at 1466 ("[This Act] may not be construed as making a substantive change in the laws replaced."); 49 U.S.C. § 11707 Historical and Revision Notes (1994).

photographs have to the Slavins, excluding fanciful or sentimental value.

United had offered the following alternative:

> The actual loss value of the Slavins' photographs is their fair market value, if any is proved, or other economic value proved, if not, excluding fanciful and sentimental value.

United stresses the word "economic" in their instruction; the Carmack Amendment itself, however, imposes liability on the shipper "for the actual loss or injury to the property." The language the court used, while it might have been clearer, captured the essence of this standard, and the court's instruction included almost the same language as United's proposal in its caution not to base any award on fanciful or sentimental value-that is, the *subjective* value to the family. Thus, even if United did not waive any potential complaint about the jury instructions on appeal, we would find no reversible error on these facts.

This leaves United with the exceptionally difficult burden of showing that the jury's award was not supported by the evidence. It cannot do so. The Gordons presented expert evidence on the economic loss they sustained as a result of United's malfeasance, and it is easy to see how the jury based its award on this evidence. The Gordons' expert testified that there were three ways in which the 15,000 photographs in the family collection could be valued: by cost of replication, by market value, considering both "low market" antique store value and "high market" dealer and museum value, or by income potential, involving sale to an agency that would then license the photographs' use. He also offered an opinion on the value for each of the photographs, using each approach. He specifically valued 900 of the photographs at a total of $52,500, using the fair market value approach. The other photos he described as a "more common" variety, which he testified could range in price from 50 cents to $20 each. He concluded that they had a "photographic cost" of about $4 each, based on selling them at "distress sale prices." United's own expert also testified that some of the photos could be worth 50 cents, while some could be worth $10. The Gordons point out that the $7,050 award the jury actually gave is the exact figure given by multiplying the remaining 14,100 photographs by the 50 cent value both experts provided. This award is amply supported by the evidence, no matter what the Gordons' attorney may have said in closing argument inviting the jury to "fill in the value to the Slavin family." (Moreover, United waived any challenge to that argument by failing to object to it at trial.) Under the circumstances, we are somewhat surprised that United chose to challenge the jury's well supported (and modest) award on this cross-appeal. In any event, the jury's award properly excluded sentimental or fanciful value, it reflected an economic measure of the actual loss to the Gordons, and it was supported by the evidence.

## B. Common Law Claims

Last, we consider the Gordons' argument that the district court erred in dismissing all of their state law claims. Although they acknowledge that the Carmack Amendment preempts "state and common law remedies ... where goods are damaged or lost in interstate commerce," *Hughes,* 829 F.2d at 1414, they argue that their claims are not preempted because they do not address the loss or damage of shipped goods. Instead, they argue, they are raising claims of fraudulent procurement of a contract prior to shipment, as well as injury caused by the claims procedure following the shipment and loss of the goods.

In *Hughes,* this court thoroughly discussed the subject of Carmack Amendment preemption. There, as here, the plaintiffs relied in part on the savings clause contained in the amendment itself, which reads:

> Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law.

49 U.S.C. § 10103. After tracing the history of the amendment and its interpretation over the years, we concluded that the Carmack Amendment bars a shipper from seeking any other remedy either state statutory or common law provides against a carrier for damages to the shipper's goods that have

been transferred in interstate commerce. 829 F.2d at 1414–15.

Nevertheless, not every claim even remotely associated with the transfer of goods from one place to another is necessarily a claim for damages to the shippers' goods, as we recognized in *Pinkerton Security Systems, supra,* 89 F.3d 452. In *Pinkerton,* notwithstanding the Carmack Amendment's limitations, the court recognized a number of situations in which a carrier might remain liable to a shipper for certain kinds of separate and independently actionable harms that are distinct from the loss of, or the damage to, the goods. *Id.* at 458. For example, the court suggested that a carrier might be liable to a shipper under a statute prohibiting deceptive trade practices, or a bailor might be able to recover from a bailee in tort if the claim for relief does not depend on the existence of a contract. State law claims for losses or damage to the cargo, however, whether described under a contract theory or a tort theory, are preempted by the Carmack Amendment.

In a recent decision, the First Circuit also had occasion to discuss the line between the types of claims that are preempted and those that are not. *Rini v. United Van Lines, Inc.,* 104 F.3d 502, 506 (1st Cir.), cert. denied, —— U.S. ——, 118 S.Ct. 51, —— L.Ed.2d —— (1997). The *Rini* court reversed a decision for a plaintiff on state law claims of negligence, misrepresentation in connection with the claims process, and violation of a state unfair practices statute, finding that each of these was preempted by the Amendment because each stemmed from the loss of the goods. *Id.* Like this court in *Pinkerton,* however, the First Circuit specifically noted that not all state claims would be preempted. It held that "liability arising from separate harms—apart from the loss or damage of goods—is not preempted. For example, if an employee of the carrier assaulted and injured the shipper, state law remedies would not be preempted. Similarly, a claim for intentional infliction of emotional distress alleges a harm to the shipper that is independent from the loss or damage to goods and, as such, would not be preempted." *Rini,* 104 F.3d at 506.

Taking *Hughes, Pinkerton,* and *Rini* together, we too conclude that the Carmack Amendment does not preempt those state law claims that allege liability on a ground that is separate and distinct from the loss of, or the damage to, the goods that were shipped in interstate commerce. Applying this test, we conclude that the Gordons' claim of intentional infliction of emotional distress (Count VI) is not preempted, for the same reasons that persuaded the First Circuit in *Rini* to find no preemption for such a claim. Their claims for breach of contract (Counts I and VII) and willful and wanton misconduct (Count VIII), are clearly preempted however, as the damage alleged in these claims is the damage to the Gordon's property covered by the Carmack Amendment (and for which the Gordons have already recovered). Their claim for a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count V), which alleges fraudulent inducement to contract, is somewhat less obviously preempted: a fraudulently induced contract could be executed perfectly, and some state courts have held that the Carmack Amendment therefore does not preempt such claims. *E.g., Brown v. American Transfer and Storage Co.,* 601 S.W.2d 931 (Tex.1980). The only Illinois appellate court to consider a similar question, however, has held the Illinois Act preempted by the Carmack Amendment. *Nowakowski v. American Red Ball Transit Co.,* 288 Ill. App.3d 348, 223 Ill.Dec. 708, 680 N.E.2d 441 (1997). While that court was interpreting federal, not state law, we defer to its judgment regarding the reach of the Illinois Act and find here that Count V was preempted.

The Gordon's common law fraud claim (Count IV) alleges fraud both in the inducement and in the claims process. Although we consider it a close call, we conclude that claims relating to the making of the contract for carriage are so closely related to the performance of the contract, and the measure of damages for such claims so likely to be the loss or damage to the goods, that they are also preempted by the Carmack Amendment. Cf. *Nowakowski.* Finally, we agree with the district court that the assertion of fraud in the claims handling

process is preempted. As the *Rini* court recognized, the claims process is directly related to the loss or damage to the goods that were shipped. Indeed, people would not be involved in the process unless either loss or damage had occurred. The Carmack Amendment speaks to the claims process, by imposing both a minimum and a maximum period of time for allowing shippers to file claims. See 49 U.S.C. § 11707(e). No matter how despicably United behaved during this process, by lying to Mrs. Gordon when she called to inquire about her shipment, keeping her hopes up, and finally dashing them, Congress has commanded through the Carmack Amendment that it must be sheltered from liability except insofar as it may also engage in conduct that is sufficiently distinct from the contract of carriage that a separate and independent claim arises. Thus, the district court correctly found that Count IV was preempted.

We accordingly AFFIRM the district court's judgment with respect to Counts I, IV, V, VII, and VIII, and we REVERSE and REMAND for further proceedings on Counts VI. We further AFFIRM the district court's judgment that punitive damages are not available under the Carmack Amendment, and deny United's cross-appeal regarding a portion of the jury's award. United shall bear the costs of the appeal.