NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1356
_____

AMG RESOURCES CORPORATION,
                                                Appellant
v.

WOOSTER MOTOR WAYS, INC.; WMW LOGISTICS, INC.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-15-cv-03716)
District Judge:  Honorable Susan D. Wigenton
_____

Submitted under Third Circuit LAR 34.1(a)
November 1, 2019

Before:  HARDIMAN, PHIPPS, and NYGAARD, *Circuit Judges*.

(Filed: January 9, 2020)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PHIPPS, *Circuit Judge*.

This dispute arose after a thirty-five-thousand-pound truckload of copper disappeared. The copper, which was valued at over $100,000, belonged to AMG Resources Corporation, and it was supposed to be transported from AMG's scrap metal facility in Newark, New Jersey, to a customer in Reading, Pennsylvania. A driver arrived, the truck was loaded and weighed, and after preparing a bill of lading, AMG released the copper to the driver, who did not deliver it and has not been heard from since.

Due to that missing shipment, AMG, a Delaware corporation with a principal place of business in Pittsburgh, Pennsylvania, filed suit in the Superior Court of New Jersey, Law Division, Essex County. But AMG did not sue the actual driver. Instead, it raised several state-law claims against two entities that it alleges arranged for the transportation of the copper: a federally licensed motor carrier, Wooster Motor Ways, Inc., and a federally licensed freight broker, WMW Logistics, Inc. Both defendants are Ohio corporations, and both have their principal place of business in Wooster, Ohio.

Wooster Motor Ways and WMW Logistics removed this action to the District Court for the District of New Jersey. AMG did not seek to remand the action to state court; instead it amended its complaint to add a count under a federal statute, 49 U.S.C. § 14706, often referred to as the Carmack Amendment. The District Court had jurisdiction over AMG's seven-count amended complaint. *See* 28 U.S.C. §§ 1331, 1332;

2

*see also id.* § 1367. And after a two-day bench trial, the District Court entered judgment in favor of Wooster Motor Ways and WMW Logistics.

AMG now appeals the District Court's ruling on two of those counts – the claim under the Carmack Amendment and a claim for breach of contract. Jurisdiction is proper in this Court, *see* 28 U.S.C. § 1291, and appellate review is *de novo* for the conclusions of law and clear error for findings of fact. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 215 F.3d 407, 409 (3d Cir. 2000). Recognizing that a reviewing court may affirm "on any basis supported by the record, even if it departs from the District Court's rationale," *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019), we will affirm the judgment of the District Court.

I

The evidence presented at trial contextualizes the missing copper shipment. On 92 prior occasions, AMG relied on WMW Logistics to arrange for transportation of scrap metal. Only once did the truck that WMW Logistics coordinated belong to Wooster Motor Ways, which shares an address and has common ownership with WMW Logistics. In all other instances, the carrier was not Wooster Motor Ways. Despite their recurring business relationships, WMW Logistics and AMG never entered into a master agreement; each transaction was agreed upon separately.

For the copper load that went missing, AMG and WMW Logistics arranged for that shipment through email. That correspondence identified the contents (#1 copper), the purchase order number (#45181-14), the point of origin (AMG Newark, NJ), the

3

destination (Cambridge Lee – Reading, PA), the load value ($76,000.00), as well as the price for the transportation ($625.00 All-In). Other details, such as the identity of the entity transporting the copper, were not included in the email chain, and WMW Logistics did not otherwise inform AMG of the carrier for the copper. As far as the timing, the parties separately understood that the copper was to be picked up at 9:00 a.m. on November 12, 2014.

To find a driver for the job, WMW Logistics advertised on online boards. Ramon Theodore Knight responded to the advertisement, and after verifying Knight's carrier license and insurance policy, WMW Logistics entered into a broker-carrier agreement with him for AMG's November 12 shipment.

On November 12, a truck with an unknown driver arrived and provided a purchase order number for the copper load. With that, the truck was weighed, the copper was loaded with over $100,000 in copper, and AMG prepared a bill of lading listing the carrier as "MKD" along with a corresponding carrier number. After illegibly signing the bill of lading, the driver left with the copper, which did not arrive at its destination and has never been located.

Based on those facts, the issues on appeal relate to whether either WMW Logistics or Wooster Motor Ways is liable for the missing copper under the Carmack Amendment or contract.

4

## II

## A

As part of the Hepburn Act of 1906, the Carmack Amendment established a uniform federal standard to govern a railroad carrier's liability for "loss, damage, or injury" to goods while in interstate transit. Pub. L. No. 59-337, sec. 7, §20, 34 Stat. 584, 595 (originally codified at 49 U.S.C. § 20(11) (1906)). Central to its original operation was the "affirmative[] require[ment]" that a carrier provide a bill of lading or receipt to the shipper for the goods to be transported. *Adams Express Co. v. Croninger*, 226 U.S. 491, 504 (1913). Significantly, by providing a bill of lading to the shipper, the initial carrier assumed liability for any loss, damage, or injury that was caused by any carrier, even subsequent carriers, during transportation. *See id.* Through that provision, the Carmack Amendment linked "unity of responsibility" with "unity of transportation." *Atl. Coast Line R.R. v. Riverside Mills*, 219 U.S. 186, 203 (1911). And that "relieve[d] shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Reider v. Thompson*, 339 U.S. 113, 119 (1950). Instead, to make a *prima facie* case under the Carmack Amendment, a shipper had to establish only three elements: (i) that the initial carrier received the cargo in good condition; (ii) that the cargo was lost or damaged; and (iii) the amount of actual loss or damages. *See Mo. Pac. R.R. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964); *CNA Ins. Co. v. Hyundai Merch. Marine Co.*, 747 F.3d 339, 353 (6th Cir. 2014).

5

The original Carmack Amendment also carried broad preemptive force. Its federal standard of liability superseded not only state law, but also any private contract between a shipper and a carrier. *See Adams Express*, 226 U.S. at 504; *see also* 49 U.S.C. § 20(11) (1906) (providing that "no contract, receipt, rule, or regulation shall exempt such . . . railroad . . . from the liability hereby imposed"); *N.Y., New Haven & Hartford R.R. v. Nothnagle*, 346 U.S. 128, 131 (1953) ("With the enactment in 1906 of the Carmack Amendment, Congress superseded diverse state laws with a nationally uniform policy governing interstate carriers' liability for property loss."). The act, and its subsequent amendments, reinforce the Supreme Court's longstanding observation that "[a]lmost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it." *Adams Express*, 226 U.S. at 505-06.

In short, the Carmack Amendment of 1906 provided shippers with a federal cause of action – to the exclusion of all others – for property lost or damaged in transportation. With a bill of lading, a shipper could recover from the original carrier for loss or damage to goods in transportation caused by any carrier, regardless of state law or the terms of any private contract. *See Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 106 (2010) ("Carmack's original premise is that the receiving carrier is liable for damage caused by the other carriers in the delivery chain.").

B

Over time, the Carmack Amendment itself was amended – many times. *See generally Kawasaki*, 561 U.S. at 106-08 (summarizing amendments to the Carmack Amendment); *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 183-87 (3d Cir. 2006). Relevant here is that after the Motor Carrier Act of 1935, Pub. L. No. 74-255, 49 Stat. 543, later versions of the Carmack Amendment covered motor carriers as well. Along with that expansion came statutory recognition of "brokers" – meaning any person, who is not a motor carrier, but who "as principal or agent, sells or offers for sale any transportation . . . or negotiates for, or holds himself or itself out by solicitation, advertisement, or otherwise as one who sells, provides, furnishes, contracts, or arranges for such transportation." *See id.* § 203(18), 49 Stat. at 545; *see also* 49 U.S.C. § 13102(2) (providing current definition of "broker"). The Motor Carrier Act did not create liability for brokers for loss or damage to goods in transportation; that exposure remained with the original carrier. Beyond those substantive changes for motor carriers, the Carmack Amendment was later re-codified so that it now bilocates within the United States Code: one section applies to railroad transportation, *see* 49 U.S.C. § 11706, while another governs the subject matter of this litigation, motor vehicle transportation, *see* 49 U.S.C. § 14706.

In its current incarnation, the portion of the Carmack Amendment governing transportation by motor carriers differs in other respects from its 1906 progenitor. A carrier cannot now avoid the Carmack Amendment by failing to provide or accept a bill

7

of lading. *See* 49 U.S.C. § 14706(a) ("Failure to issue a receipt or bill of lading does not affect the liability of a carrier."); *CNA Ins. Co.*, 747 F.3d at 355 ("Carmack's requirement that the initial carrier issue the shipper a bill of lading is not a requirement to form an actual contract, though that is certainly acceptable and typically anticipated . . . ."). A shipper can also sue any carrier, not just the original carrier. *See* 49 U.S.C. § 14706(a), (d). A carrier may also agree with the shipper in writing on the value of the goods in transit. *See* 49 U.S.C. § 14706(c)(1)(A). The statutory definitions have also expanded to encompass modern transportation. *Compare* 49 U.S.C. § 13102(3) (defining "carrier"), (23) (defining "transportation"), *with* 49 U.S.C. § 10102(2) (1982) (defining "carrier"), (25) (1982) (defining "transportation").

Those amendments, while important, do not change the central operation of the Carmack Amendment. The elements of the *prima facie* case have remained constant. *See, e.g.*, *Paper Magic Grp., Inc. v. J.B. Hunt Transp., Inc.*, 318 F.3d 458, 461 (3d Cir. 2003); *Beta Spawn, Inc. v. FFE Transp. Servs., Inc.*, 250 F.3d 218, 223 (3d Cir. 2001). Nor have the amendments altered the Act's preemptive effect. The modern Carmack Amendment still preempts all state regulation regarding the loss or injury to goods in commerce, so that the shipper's recourse is only against carriers. *See Certain Underwriters at Interest at Lloyds of London v. United Parcel Service of Am., Inc.*, 762 F.3d 332, 335-36 (3d Cir. 2014).

8

III

On this record, neither Wooster Motor Ways nor WMW Logistics is liable under the Carmack Amendment. The first element of a Carmack Amendment *prima facie* case is delivery to the initial carrier in good condition. *See Mo. Pac. R.R.*, 377 U.S. at 138; *Beta Spawn*, 250 F.3d at 223. But no evidence indicates that either Wooster Motor Ways or WMW Logistics arrived at AMG's Newark facility as the initial carrier to pick up the copper load. And although the current version of the Carmack Amendment permits suits directly against subsequent carriers, *see* 49 U.S.C. § 14706(a), (d), there is no evidence that Wooster Motor Ways or WMW Logistics later transported the copper load. Therefore, AMG cannot recover from either entity.

IV

AMG fares no better with its breach of contract claim. As explained above, the Carmack Amendment provides the exclusive cause of action for loss or damage to goods transported by a motor carrier. *See N.Y., New Haven & Hartford R.R.*, 346 U.S. at 131; *Adams Express*, 226 U.S. at 504; *Certain Underwriters*, 762 F.3d at 335-36. Since separate state-law claims for loss or damage to goods are preempted by the Carmack Amendment, AMG cannot recover on a breach-of-contract theory for the loss or damage to goods.

But even if a breach of contract claim were permitted, the District Court did not err in finding that the brief email exchange does not indicate that Wooster Motor Ways or WMW Logistics assumed responsibility for non-delivery of the copper. *See AMG Res. Corp. v. Wooster Motor Ways, Inc.*, 2019 WL 192900, at \*3 (D.N.J. Jan. 14, 2019). Without such an agreement, Wooster Motor Ways and WMW Logistics cannot be liable for breach of contract.

V

For the foregoing reasons, we will affirm the judgment of the District Court.